## Southern Mining Co. v. Cornelius.

Nov. 22, 1940.

James M. Gilbert, Judge.

H. C. Gillis and Logan E. Patterson for appellant.

Golden & Lay and R. L. Pope for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

Appellee, about 44 years of age, on the 16th day of

December, 1937, was engaged in digging and loading coal in appellant's mine, when he claims he received injuries which totally incapacitated him for manual labor. While he was at work at a distant point, a large piece of rock or slate fell from the mine roof onto the entry track. In order to relieve this situation, the track foreman adopted what is known as the "dobey" method, described as placing sticks of dynamite on top of the rock, covering the charge with muck, placing thereon rocks with which to weight it down, then firing the charge, admitted to be the usual method.

At the time Cornelius, his son and another, were engaged in loading coal. Whether the place where they were working was 80 or more feet from the point where the blast occurred, was a disputed question, the first estimate being perhaps correct. Appellee sought recovery on the ground that his injury was the result of the employer's negligence, and recovered judgment in the sum of $4,264.66; the parties not operating under our Compensation Laws, though apparently eligible.

It was charged that appellant, by its servants:

"Negligently and carelessly * * * caused, suffered and permitted a large quantity of dynamite to be exploded in close proximity to his work place, * * * without warning."

Appellee describes the effect of the explosion upon his person; that his eardrums were permanently injured; the nerves on the right side were injured; his eyesight impaired, with the general result that he is now extremely nervous, loses much sleep, cannot walk steadily, and is unable to engage in any manual labor.

Appellants denied the allegations of the petition, pleading affirmatively that at the time of the alleged injury, plaintiff's negligence was "the sole cause of the injuries." A reply in denial completed the issue.

From the testimony it appears that appellee had been engaged in mining for the appellant company for a long time, and had worked "every day when the mines ran." That before the alleged injury he had low blood pressure, and at one time malarial fever, but he says that prior to the explosion there had been nothing wrong with his eyes, ears or "general nervous condition," or his balance in walking.

The charge of dynamite was set off about 9:30 a. m., shortly after Cornelius and his son had started to work. There is little dispute as to the location of the rock. It is shown that in a straight line from the rock to the point where he said he was working, the distance was 80 feet. In order for the force of the explosion to reach Cornelius directly, it would necessarily have to go through a pillar of coal about 36x48 feet in size. In order to reach Cornelius through an airway the force would travel a much greater distance.

At the time of the explosion Wilson was 80 feet from the rock and behind a coal block, in more direct line of air travel; Lawson and Nelson were 60 feet, Bowen and Douglas, approximately 100 feet away; Bowen and Paralori, 175 to 180 feet, all in somewhat similar positions as to airways, and perhaps intervening coal blocks.

Nelson was the track man; he says the fallen rock was 6 to 8 feet wide and about 3 feet thick. He put four sticks of dynamite on the rock, placed over them a half-bushel of wet muck, and on top of this three sand rocks weighing altogether about 90 pounds, the usual method, except he says that he ought to have used two more sticks of dynamite.

After he had fixed his fuse, he sent Bowen, who was working with him, up the track, through the break and to another entry; Nelson went back up an air course to a point where Lawson was working, and told him he was going to "shoot"; these two were 60 feet away. These miners say the explosion made a "keen crack," and all, with the exception of Cornelius say the firing of the shot had no effect on them. The boy said that soon after the shot, his father "checked down" in his work, and complained of his head hurting, and stopped work about 1:30 p. m., and went home. Both say that the drift of the air towards them carried a lot of dynamite smoke.

In brief for appellant it is contended that it was entitled to a peremptory instruction, because the proof failed to show negligence, proximate cause of the injury, or causal connection between the explosion and the condition of appellee, which it is contended resulted from other causes. This appears to be the most serious contention, and will necessitate a review of the proof

on that point. We note that the court very reluctantly overruled appellant's motion for a peremptory, made at the close of plaintiff's evidence.

At the time of the explosion appellee says he was stooping over to load some coal, and the "crack and jar staggered me;" that in about five minutes he got sick at his stomach, and his head began hurting. It is admitted that no flying missile struck him. After the explosion appellee remained around the mine until work stopped, at 1:30 p. m., when he went home. He did not go to the place where the shot had been fired, nor did he make complaint to his employers, or his fellow employes, either in or out of the mine, that day or thereafter until much later. Appellee got up the next morning and attempted to do some chores, but went to "pitching and staggering," though he made no complaint to his wife or any one else. He went to the mine, but says he got sick; left the mine and went to the doctor's office, thence home and to bed. Later he was sent to a hospital, where he remained for a week. While he stated that he had not been able to work, there is no showing that he tried to do so, except on the day following the explosion, when he worked for an hour or more.

Counsel for appellee correctly says there are two theories as to the cause of appellee's injuries; his theory that his condition arose as a result of the explosion, and the other that the condition was due solely to other causes, hence proof on these theories make an issue for the jury. This is correct, and ordinarily the issues should be submitted unless there be such failure of proof as would authorize the court to withhold the case from the jury.

It is well settled in our courts that whether the alleged disability is the proximate result of the negligent act charged, or arises from other causes, should be established by persons skilled in the medical profession, since they alone are able to express an opinion on the subject. Hardy-Burlingham Mining Co. v. Hurt, 253 Ky. 534, 69 S. W. (2d) 1030, citing Donoho v. Rawleigh, 230 Ky. 11, 18 S. W. (2d) 311, 69 A. L. R. 1135.

Eight doctors testified, three for appellee and five for appellant. An examination of the record discloses the fact that not one of the eight testified, at any time

or anywhere, that in their opinion such disability as appellee claimed, and as they, or some of them, found to exist, prevented appellee from working. It is true that a number of them agreed that the disease attributed was perhaps of permanent character; a majority thought the disease was curable, under proper treatment.

The explosion occurred on December 16, 1937. Dr. Kincaid, an eye and ear specialist, examined appellee on May 28, 1938, admittedly not for the purpose of treatment. Appellee described his symptoms and told him he had "been subjected to an explosion of dynamite in December 1937." The doctor concluded from his examination that he had some trouble with the internal parts of the ear, but whether it was labyrnthitis, sometimes called Meniere's disease, he would not say. "He gave me a history that I thought he might have had labyrnthitis."

The doctor, when asked whether or not a dynamite explosion, or sudden concussion of the air, might cause the disability, said: "If the person was in the midst of an explosion, by the pressure of the air waves, one could be injured." The doctor described the condition in which he found appellee at the time of examination. This witness was then propounded, and answered, a hypothetical question (in deposition) but the court, as was done when each of the appellee's expert witnesses was asked a similar question, we think correctly, did not permit the jury to hear either question or answer. We say this because upon examination the questions were without proper foundation, including some facts not proven, and omitting some which should have been included.

And on this point, speaking now of the hypothetical questions, it appears unusual that such should be propounded to an expert witness who had received a history, and had made a close physical examination. Such procedure would at least indicate an omission of causal facts or symptoms. This witness did say that he found no indications of pre-existing disease, which might cause the disability, but he was apparently without history as to condition previous to December 16.

Drs. Terrell and Brown, general practitioners, examined appellee on January 5, 1938; neither for the purpose of prescribing treatment. Reviewing the former's

testimony, we find that appellee gave a history of his troubles, including, as the doctor said, "a terrific explosion." The examination made was routine, with "especial attention to the eyes, ears, and nervous system." He found nervousness, instability, and a defect in one of his ears, and perhaps some eye trouble. His opinion was that appellee was, or had been, suffering from labyrnthitis, which might have been caused by a "fierce shock or violent concussion, or what might have been a heavy charge of dynamite if one was unprepared for it." Further that the "jar or shock" might be produced by a "blow on the ear, or some metallic or wooden substance," or by sudden concussion. This doctor then eliminated catarrh, bad teeth, or venereal disease, as being the probable cause, and assuming that the symptoms and his condition developed "almost immediately following the explosion, would be an indication that the explosion was the exciting cause." The witness had treated patients for labyrnthitis, in some instances resulting from explosion, but did not recall any "specific explosion."

Dr. Brown diagnosed Meniere's disease, which might result from infection or traumatic injury, or a violent concussion of the air. He found the same condition as described by Dr. Terrell, though he expressed the belief that it might have resulted from catarrhal or tonsil trouble. On cross-examination he said he was speculating as to the cause and effect. He had never treated a case of Meniere's disease, nor had he ever heard of a case resulting from air concussion. He went through a category of ailments which might produce the condition of appellee, saying that if it were labyrnthitis "it would be more apt to come on gradually."

Dr. Rose (for defense) had known appellant from 1929 to 1935. He treated him at intervals for dizziness, headaches, loss of strength, and "things of that sort." His blood pressure was low, and he was anemic, "his ears were not healthy, but you couldn't tell definitely what was wrong." This doctor prescribed a tonic and cathartics for him; at one time quinine for malaria, but during his treatment discovered no permanent improvement. With his long experience around the mines he had never heard of a similar injury, except where there "were flying objects."

Dr. Hendren, company doctor, had treated appellant

during the two years prior to December 16, for stomach trouble and chronic catarrhal condition. "He was anemic; had low blood count and a general run down condition; complained of dizziness, pains in his chest, headaches, and was unsteady in his walk." His treatment gave temporary relief.

Witness saw appellee shortly after the 16th of December. He complained of headache and dizziness. He prescribed for him. The doctor was positive that appellee did not mention the explosion, nor did he complain about his ears or head. He came to the office two or three times on successive days, but made no mention of the explosion. Dr. Hendren went to Florida for two weeks. On his return appellee came to see him and attributed his condition to the explosion. He sent appellee to Dr. Woodbridge, a specialist, who found a slight retraction of the ear drums; impairment of hearing on the right side. He thought the retraction was not of recent cause. He found indication of catarrh. This doctor was positive that his examination did not disclose a condition arising from the explosion.

Dr. Woodbridge admitted that on January 3 he had advised Dr. Hendren that he "believed we could infer that the explosion affected the 8th nerve on the right side," and he prescribed proper treatment, and expressed the opinion that the trouble would be relieved in four to eight weeks. When recovery did not result he came to the expressed conclusion that the disability was due to other causes. In rebuttal, witness denied that Dr. Rose or Dr. Hendren treated him "for tingling in the right side of the head, dizziness or instability, or being run down." Dr. Rose did treat him for malaria. He does not deny that Drs. Rose and Hendren had treated and prescribed for him, and says he told them that he was hurt in a dynamite explosion, but does not say when he gave the information.

At the suggestion of Dr. Brashear appellee went to Louisville to see Dr. Spurling, a recognized nerve specialist. Dr. Spurling, as is manifested by his deposition, gave the patient a thorough examination. He said the appellee was of the "apprehensive type," and did not co-operate. He suspected from his actions he was malingering. The doctor frankly stated that from his examination and "this man's story," that he had an at-

tack of labyrnthitis in December, but that he was fully recovered. He found no indications of eardrum rupture, and was positive there was no evidence of Meniere's disease. He had observed many similar cases, but none where the trouble resulted from explosion, unless there had been traumatic injury to the skull. The doctor continued:

"I was impressed with the fact that he appeared to be unsteady, when I felt definitely he was not. All reflexes were normal, the only findings in the case were the subjective findings, and I saw nothing in my examination to indicate he was unable to work."

Dr. Brashear had also expressed the belief that after observation, "we are doubtful and feel that he is malingering." Dr. Spurling frankly admitted that he had reported to one of the other doctors: "Based on this man's story, I would have to conclude he had a labyrnthian attack at the time he had these symptoms," and added: "Whether or not this labyrnthitis was secondary to the explosion is questioned in my mind." The doctor at the time of giving his deposition, said that he was still of the same opinion, that is, that symptoms indicated former labyrnthitis, but he was positive at that time that if it were due to concussion, proper treatment would work a permanent cure.

Without further or minutely detailing the expert evidence, we may say that we have looked carefully to such evidence and find none that is of more than speculative character. Dean Branch Coal Co. v. Collins, 280 Ky. 1, 132 S. W. (2d) 310; Collins' Adm'r v. Gatliff Coal Co., 196 Ky. 517, 244 S. W. 887.

Taking the evidence as a whole, it may be gathered that at some time appellee had suffered, or was then suffering, from an attack of labyrnthitis. No doctor testifies in such a way as to permit us to conclude that the explosion was the proximate cause of his condition. The proof was insufficient on this point to carry the case to the jury; on other points discussed we do not express, but reserve, opinion.

Judgment reversed, with directions to grant a new trial, and if there be no more convincing proof on the point discussed, the court should direct a peremptory.